Good afternoon. We have our postponed case of, I guess it's now Winters v. Redners Market. Mr. Quirk. May it please the court, Michael Quirk of Williams, Kruker, Berezovsky for the appellant, Kedemtha Johnson Winters, as a state representative of Sammy Perry. With the court's permission, I'd like to reserve three minutes of my time for rebuttal. That's granted. The district court granted summary judgment on Mr. Perry's Title VII and PHRA retaliation claims, despite substantial evidence supporting all of the elements of his claim and refuting the proper justifications that the defendant gave for both reporting him to the police and terminating his employment. Well, about refuting these, some of the briefs seem to maybe mix up, maybe not your brief, but the prima facie case has to be proven first, then we go to the legitimate nondiscriminatory reason, and then we go to pretext. So we're talking about a prima facie case right here, right? Correct. And with respect to the prima facie case and the causation element of the case, I think that the primary authority is the court's decision in Farrell v. Planters-Lifesavers, where the court acknowledged that evidence that fills the causation element of the prima facie case may very well overlap with the evidence that demonstrates pretext, that essentially the confusion and contradiction within the defendant's proper justification can be one of the types of circumstantial evidence that can support an inference of an impermissible reason for the adverse action. Are you still frightened of the idea that it's not but-for causation? In your reply brief at note 4 on page 20, it looks like you're trying to avoid the impact of Nassar. Do you have any support for your assertion that Nassar only applies in a mixed motive case? Well, I would refer to the court's decision in the Woodson case. This court got to where the Supreme Court got in Nassar 15 years earlier. What this court did in Woodson was look at the proofs required for a pretext type case like this one and the proofs required for a mixed motive case like came before the Supreme Court in Nassar. Let me ask you more pointedly, Mr. Quirk. Do you have any case that says that decision that the Supreme Court rendered in Nassar, you may have a retaliation case, but unless it's a mixed motive case, Nassar doesn't apply? I'm guessing you don't have anything like that or we would have heard from you, right? Although I'm not aware of that, I'm not aware of any case holding otherwise that Nassar displaces the McDonnell-Douglas framework. Nassar just says pretty directly and emphatically and over a vigorous dissent that in a retaliation case under Title VII, you've got to show but-for causation. That's the holding of the case, right? That is the holding of the case. What I'm not aware of is any case saying that the McDonnell-Douglas framework doesn't get you to but-for causation. That would be the question. And so the court has always applied the McDonnell-Douglas framework to retaliation cases, and that's what we're arguing that nothing has changed on that. I thought you were suggesting that Nassar didn't apply. I thought the import of footnote four was, hey, don't apply but-for causation here because you should really apply one of the motivating factors as the causation standard. But if I'm understanding you now, what you're saying is, yes, Nassar applies, but-for causation is the standard, but it's applied within the context of McDonnell-Douglas burden shifting. Have I understood you correctly? That's correct. And turning to the McDonnell-Douglas burden shifting, I would again refer back to the court's Farrell decision where it acknowledged that the circumstantial evidence of the causal link in the prima facie case may bleed into the pretext evidence that discredits the proper justification. And that's also consistent with the court's later decision in the Burton case where it underscored that evidence discrediting the employer's proper justification for the adverse action is enough to create a jury question on all elements of the underlying claim. As long as you're on Farrell, let me ask you this. In Farrell, the court reserved decision on the question of whether temporal proximity alone was enough to establish causation. In this case, are we going to have to decide that question? No, not at all. I think that the way that the court addressed temporal proximity in Farrell is really sufficient to get in this case. The court looked at it as one type of circumstantial evidence, and then because there was other circumstantial evidence presented, namely evidence discrediting the proper justification, the question of time proximity alone wasn't presented. Nor is it presented here. You seem to be doing the jumping ahead that Judge Chiguera noted some concern about. I understand that the same kind of evidence might be relevant to pretext as is relevant to causation, but what are you relying on to say, look, this is the other evidence besides temporal proximity, if you accept our theory of proximity, that indicates a causal link, some kind of animus, some kind of retaliatory motivation? Essentially, there are three types of evidence. One, we believe that temporal proximity properly looked at is at least relevant, even if not decisive. I'm just agreeing with that. I'm just asking you on the facts. What are the facts you're pointing to? Since you say we don't have to decide temporal proximity is enough, that implies you've got other things you believe show causation. I'm asking you to be real specific about what it is that demonstrates that. The intervening animosity would be Mr. Perry's co-worker overhearing the supervisor, Mr. Golden, say just because Sam filed that complaint doesn't mean that I can't fire him. That's at least an example of animosity between the protected activity and the adverse action, but the really strong evidence is just all of the holes in the justifications given for the adverse action. It's inconsistent. At some point they said if he'd come back, they would have told him he was fired. I think it's at page 694, 95. If he'd showed up, he'd have been told he had been terminated, and they said he was terminated as of the 22nd when actually later they're saying, no, he was terminated on a Monday, but if there's two days' notice required, he would have been terminated on the Tuesday because two days' notice is required. That is correct, and it's actually the inconsistency and the contradictions within the defendant's explanation of what happened. It's actually quite a bit worse than that. Who was it who testified that certainly if you know you were taken out? I think it was a woman who testified that you didn't know you were terminated. It was the company's representative who was interviewed by the unemployment compensation investigator. The PHRC. Right. Well, no, this actually was for she was interviewed for Mr. Perry's unemployment compensation. Did Daly testify that he'd be put on leave and provisionally let go and he'd be notified after the investigation was over, something like that? Not the latter, but what Mr. Daly testified really can't be squared with the interrogatory answer that Your Honor started with because the interrogatory answer alone creates confusion because it starts by saying he was terminated for job abandonment because he never came back. But then it goes on to say, however, based upon the information about the credit card and his user fraud, if he had come back, he would have been advised that he was terminated. So the termination already happened before he failed to come back. Ms. Rose Conville, she was in the HR department for Redner's, right? Correct. Okay. Correct. So the interrogatory answer, Redner's position is that if Perry had shown up, he would have been told he was terminated. Now, what's interesting is what Mr. Daly said in his deposition was, we always wait for the conviction before we terminate. This is at page A503, that's page 248 of Mr. Daly's deposition. So we always wait for the conviction before we terminate. It's knowledge I have from previous incidents. We always wait for a conviction. Now, what's odd is, so there's evidence of a company policy of not firing at the point of arrest but firing at the point of termination, and yet the Redner's interrogatory answer says he was fired at the point of arrest. And the question there is, why was Mr. Perry treated differently from the policy observed by Mr. Daly in other cases? And so what it really comes down to is their explanation for the adverse action of termination just, it's at war with itself. And in addition to that, their explanation of how they got Mr. Perry's name to the police and how they got him arrested, that's also problematic. Well, the real problem, it seems to me, the district court never realized that the 830 tape was given by Redner's rather than the 815 tape. Isn't that correct? The district court thought that the police came up with that. I mean, that's kind of a basic problem with what the district court did here, isn't it? Well, that is a basic problem with what the district court did. Redner's has renewed that argument here. It says that Redner's argument here is the police requested the video that happened to have Perry in it. The problem is there's nothing in the police file showing that, and Redner's security director at the time this all happened testified that the police couldn't have requested the times and the aisle number because that information is only available at the point of sale. And we have a conflict between Daly and Golden as to who reported the name, who reported that it was Perry. And in that sense, there are even conflicts within pieces of evidence. The interrogatory answer went from Golden to somebody else. Mr. Daly's answer went from it was Brian Goldman, no, it was Dennis Trowbridge. But Dennis Trowbridge testified that I only worked with Perry for less than a week. I wouldn't know him if he walked through the door. And so all of that evidence pointing holes in not just how they terminated Mr. Perry's employment, but also how they got Mr. Perry to the police, all of that should be considered as evidence of causation. Well, going back to causation, because some of what you were talking about is adverse action, I thought on page 24 of your adversary's brief he points out, if there was really discrimination going on here, then this is, I guess, what they would say. Ledner's accepted Perry's injury without contest, paid the indemnity benefits and medical costs without complaint, continued his employment for years and offered him an appropriate job with restrictions that his doctors said he needed. Is that really a company who's discriminating? My time is up, but if I could just answer really quickly. I mean, our view is veterans would be free to submit that evidence to the jury, but that the jury should not look at that evidence in isolation. It should look at it in the context of things like Mr. Goldman saying, you know, just because it doesn't mean I can't fire him. And, you know, even Ms. Elam saying that, you know, I felt like they wanted me to point to Mr. Perry. So all of that should be considered. All right. Thank you. We'll hear from you on rebuttal. Mr. Elliott. My name is Jeff Elliott. I am with Kozloff Stout. I represent Redner's Market, the appellee in this matter. And let me just start with Judge Rendell, your questions about what appears, as I listen to your questions, the rank confusion that's apparently going on at Redner's regarding how its HR department functions in this case. First of all, there are multiple people who are working Mr. Perry's circumstances. He has a worker's comp matter pending. He has been taken from the workplace, and he was not at the workplace where he was supposed to be assigned to work after he was discharged or released by the police. I'm sorry. I'm not understanding where you're coming from. Let me direct you to the district court's opinion. Aren't there some things missing from the district court's opinion in terms of what happened here? I don't think so. Clearly, Redner's provided the police with a tape that was not the right tape. And there's testimony of record saying that's not the tape that goes with the relevant number. The video doesn't match the journal. So Redner's had to have supplied the wrong tape, the 830 tape versus the 815 tape, did they not? This is not an exact science, this process of taping and producing tapes. I don't agree with the court at all. No, no, no. I'm just saying the lower court did not miss anything in this case. It isn't just let's look at the time only. Well, it said that the police provided the tape. And yet it was Redner. Someone had to have given the police what was the relevant tape, which would have been the 815, 29, the 112, and the 210. And instead they gave them the 830, 835. And I actually watched the tape, so there. They gave them the 830, 835 tape. You would have seen Mr. Perry in the tape. Yeah, the 830 tape, but it's the wrong tape. There's a presumption at work there. It isn't the wrong time. Well, when you say it's not the wrong time, according to your client's own records, 815 is the timing. Redner's is the one that's got the timing on the transaction. The police don't, right? There is a, there is. Correct. 601. The time's not right, whether it was 22 seconds or not. It's 15 minutes off, says Mr. Elliott. It is 15 minutes off, Your Honor. Nobody disagrees with that. I've looked at the electronic journal. I know all of the other pieces here. Well, why didn't they give the police the 815 tape? There was no 815, Your Honor. That is a fiction in this matter, that there were pieces of tape that existed when the police asked for this information. But the sale occurred at 815.29. Your Honor, I'm not sure the sale. Is there a dispute about that? There is a dispute about what the electronic record reflects as the actual activity. No, no, no. I'm saying the point of sale of the use of this. The credit card was swiped, and on the cash register, presumably, it was at 8 o'clock, 15 minutes, 29 seconds. And the next one was at 1.12, and the next one was 2.10. So why would someone say, oh, well, we have a video from 8.30? That's probably really relevant here. I don't think anyone said that, Your Honor. Nobody said there are two pieces of tape except for the phone. I'm not talking about tape. Well, let me ask you this. When you say nobody said that, how do we know somebody said that? How did the district court know? Why aren't you just inserting fact-finding into the record the way the district court did? Well, I don't think that the lower court inserted fact-finding, Your Honor, into his analysis. I think that the district court looked at all of the evidence, including the fact that all three of these transactions came on the 7th of December. They all came in the morning. They all came with master cards. I realize it's impolite, but when we interrupt, you've got to stop so we can ask a question, all right? I understand, Your Honor. Okay. So to get to the heart of it, to get to the point of it, you seem to acknowledge that the police couldn't have said, give us these timed pieces of the record because they didn't know it had to have come from Redner's, right? Because Redner's is the one who had the electronic journal entries and could identify when the transactions took place, correct? If you look at the Montgomery Township police record and its chronology, you see that the inquiry was what came to the police from the victim of the crime was nothing but a bank statement that showed date, time, and amounts. I'm not communicating, so let me try again, and I apologize. I'm asking, as a matter of logic, if the record of when the transactions took place was exclusively within the control of Redner's, then the information about which pieces of video to look at had to have come from Redner's, not from the police. Is that true or not? Well, your underlying presumption is that the control was solely Redner's. If you recall, the testimony of David Clark, who was the predecessor to Mr. Daley, indicated that, in fact, there is a third-party mechanism, that is a credit card reporting entity, that reflects the times as well. But it's not the police, and the district court said... But the police have access to it, Your Honor.  At the most, you can say there's a factual question of where that information came from. You can't say, as the district court did, that the police are the ones who said, give us the time. That's a fact-finding, because at the best, you can argue, is we don't know where it came from. What exactly... Is that right? I will cede to the court that there is a factual issue as to whether the transaction occurred at 8.15 or 8.30 And as soon as you acknowledge that, Mr. Elliott, as soon as you acknowledge that, don't you have to acknowledge the truth of Judge Rendell's premise, that the district court left out some significant information? Because it's pretty significant to the district court's findings and its conclusions, that the police are the ones that said, give us this at 8.30, and it didn't come from Redner's. If that premise of the district court is not correct, that's a significant point, isn't it? That is not the time that came. The only thing that the police asked for, Your Honor, were records of events that occurred on September 7th. The times didn't come from Redner's until after the tape was produced. So what Mr. Daley said in his testimony was that, if I may, what the police asked for was a September 7th transaction, a transaction. The first question was a morning transaction. Mr. Daley wasn't given time by the police, and Mr. Daley wasn't looking for particular times. He looked at times when the three transactions were occurring. He did have that information. Right, which was 8.15. A $1.98 or a $1.80. Yes, Slim Jim, which was 8.15, right? I don't even know if it was a Slim Jim, Your Honor. I know that the transactional amount matched the video transaction. The purchase amounts are consistent throughout. I don't think the judge must be— I'll just read it to you, okay? You seem to be fighting what's in the record. This is at 8.10. It's page 6 of the district court's opinion. Corey Daley, Redner's loss prevention officer, learned from the police that one of the transactions occurred at register number 9 at 8.30 a.m. That's the district court's statement. That seems to fly directly in the face of what you're saying, Mr. Elliott. That's the court saying that. And what we're asking you is how can the court say that when the record seems to imply something different or at the least that it's not clear where that information came from? I think it's completely clear. This isn't a burden. I think the judge— So you think it's clear in the record that the police told Redner's there's a transaction at 8.30 a.m. at register 9? I don't think—I think what the—I know what the record says, Your Honor. You're asking me to surmise how Judge Stengel got to that conclusion. No, he's asking you is that correct? Was this exactly correct, that Daley learned from the police that one of the transactions occurred at register 9 at 8.30 a.m.? The answer is yes. Where is that in the record, that the police told Corey Daley this? I don't think that is in the record, Your Honor. Well, that's what it learned from the police. But there's a lot more that's in the record, ma'am. Well, there is a lot in the record. There's the entire transaction, the entire picture of the transaction. That may be, Mr. Elliott, but I don't think you aid your case by asserting that something's in the record that isn't in the record because I think we've spent a lot of time with this record and there's nothing that we can find, and you're not helping us, to find where there's a record statement that the police gave Corey Redner the time, 8.30 a.m., register 9. If you can show us where that is, I wish you would because logic seems to dictate contrary to that, given what is in the record, and given that we haven't been able to find anything to that effect. The court's conclusion is that the police communicated an 8.30 transaction to Mr. Daley. You want me to acknowledge that there's no specific piece of evidence that says from police officer Ward, I need that videotape for 8.30. That's not where the court looked at the evidence in the case. There is no such communication. Police officer Ward did not communicate that. Okay, so the district court was wrong. The district court was not wrong. He looked at everything. What supports the statement of the district court? What evidence is there that Corey Daley learned it from the police? We've got a huge appendix. I brought it because I want you to tell me. Are you saying that Redner just simply turned over all morning transactions, hours worth of tape, and the police picked through it? No, I'm not, Your Honor. I'm saying that there is a dialogue that if you look at the Montgomery County Police record, the chronology and his communications prior to the arrest date with Daley and Golden, Golden is not involved with this. It's Daley who is the security director. Well, you assume Golden is not involved, but Daley didn't know Perry. Golden's not even on the property at the time. Well, but he's the supervisor of the store. What's the point? Daley testifies that Golden is the one who told him. It's Sammy Perry in the picture. Daley didn't know him. Again, Golden didn't work with him. Daley didn't know him. Right? Daley didn't know Perry. Yes, ma'am, that is correct. Daley did not know him. So somebody had to tell Daley that this is the relevant tape and this is Perry, right? Yes, ma'am. The point that I'm making is that the police report reflects that there's a dialogue that's going on between the police and Mr. Daley. Daley is responding to information the police have about these transactions. Let me ask you another fact question. Does the district court talk about what happened when Perry was arrested and taken from the store and that he was told by the officers, Thomas, not to come back again, not to set foot? He's terminated. Does he notice that fact? Well, the only thing that the trial court does is to indicate that Mr. Perry himself acknowledged that no human being spoke with him at all during the arrest process. No one of Redner's. No human being from Redner's spoke to him. Right, from Redner's. But Daley was there when it was communicated by the officer, you're terminated, don't come back here. That's correct. Okay. That's kind of an important fact, isn't it? I don't think so, Your Honor. This is a police officer. They go into stores. They take alleged perpetrators out of the workplace all the time. There's no evidence of record that there's any communication. There was a case that we were talking about with your colleague here about, you know, what happened on the 22nd and what was he arrested? He was arrested then. They fired him on the 26th, but the charges weren't withdrawn until the 27th, so he was presumably going to come back into the store. And he abandoned his job when the charges were still pending against him, when they said, you know, while he was still under investigation, he shouldn't come. He was deemed terminated. I mean, isn't there a lot going on here? What exactly happened here? What is this abandonment idea that Redner says? First of all, there's less going on than I think that Mr. Cork is suggesting. But what if he came in on the 25th? The 25th. He should have been working. He should have been working, but the charges weren't withdrawn until the 27th. Should he really have thought he's going to show up for work while he's been? He's not in police custody, ma'am. He was brought in and released straight off. The charges were still against him. If he had shown up, as somebody testified, surely he would have shown, known he was terminated. I believe that the record also indicates, Mr. Diley indicated, that he had figured out long before that the other two transactions were not transactions that involved the appellant and that they had a confessed individual. Yeah, but there was a five-day lag between their learning about that from ELA. Is Rose Conville's statement that if he had shown up, he would have been told to leave, is that the sort of factual statement about Redner policy and what really happened that a jury was entitled to hear? No, Your Honor. The question that I ask in response to that comment is how can that possibly be relevant to issues associated with this man losing his job the way he says, which is in a retaliatory way? Well, there's two important responses to that. First is, you know, I'm assuming that's a rhetorical question because you don't get to ask us questions. No, it is a rhetorical question, Your Honor. I'm not intending any disrespect. And the question to you is doesn't an HR personnel's statement about what actually happened, this isn't somebody disconnected from the events, this is the HR person for Redner saying if he had come, he would have been told to leave. That's a statement of historical fact. It might be wrong, she might be misguided, and maybe a jury ultimately would conclude that he wouldn't have been told to leave. But isn't it something that a jury's entitled to hear in assessing your assertion that he abandoned his job not that he correctly understood he was fired? Your Honor, no, I don't think it is. I don't think it does get to the jury. It's a question to an HR official about what might have happened in the future. No, but it has to do with the consistency of the reasons that under Farrell can be relevant to causation. And more to the point, it has to do with whether he was actually fired or not. Does her statement not mean he was fired on the 22nd, the same way our internal documentation says he was fired on the 22nd? We all understood he was fired on the 22nd, and Sandy Perry understood he was fired on the 22nd. That's the nature of her statement. It's not some speculative question about what would have happened. It's a statement of, or it could certainly be read as or understood as, a statement of historical fact, he was fired on the 22nd. Is that not something that a jury is entitled to hear? Absolutely not, and certainly not with all due respect as the court casts it, because in the circumstances of a store's HR department, we just have an individual who was arrested and taken from the scene believed to have committed a theft in the store. You have that piece of evidence, and then you have a question posited to an HR person who is in the corporate offices asking, all of this points to the fact that he was terminated when the company then says he abandoned his job by not showing up when these charges were pending. These are unemployment compensation issues, Your Honor. What is the difference of how his employment ends in this case, frankly? It's a huge... No, absolutely not. If his employment ends by virtue of his being arrested, as Redner is aware, and they believe as they analyze this at-will employee's circumstances, he committed this offense, what is the relevance or the difference between that and whether or not they have an opportunity to take the position that he abandoned his job on September 25th by not showing up? Well, I guess the question is, and this is on page 17 of your brief, Mr. Elliott, you say, Perry must show that Amos was the but-for cause of the termination. That's your assertion about causation, and we may very well think you're exactly correct, but the question is, doesn't a jury get to look at this and say, you know what, they said some things that certainly look like they believe he was fired at the time, and then they say some other things that say he abandoned it. We get to decide the credibility that Redner springs to the table here in deciding whether there's but-for causation. Moreover, under Farrell, the whole idea of inconsistent reasons is entirely relevant. I understand that, Your Honor. Your Honor, the point that I make in responding to your comment is, I don't believe that that Amos is evident under any circumstances simply by virtue of the fact of an end of employment, and that's where we disagree with the appellant. Nobody fired him and said, never come back here. That doesn't seem so. Mr. Elliott, that doesn't seem like a fair statement of your opponent's case. I never have read or understood anything Mr. Quirk said here to mean the mere fact of termination by itself is actionable. Their assertion is, when you look at the relationship between Mr. Golden and Mr. Perry, and when you look at the conflicting and self-contradictory statements about why he was fired, how he was fired, we have enough to get to the jury. That's their assertion, and this all we just launched with Judge Rendell asking you, didn't Judge Stengel, superb judge, but didn't he leave out some important things like this conflict about where the information of the tape came from or whether Perry was given to understand he was fired or not? Those things don't make it into Judge Stengel's opinion, isn't that problematic? So at the end of this argument, I put it to you again, isn't it problematic that those things aren't addressed in Judge Stengel's opinion? I disagree with the court's assessment of Judge Stengel's opinion, and I think because Judge Stengel makes three or four definitive statements about what the evidence, which he indicates repeatedly he reviewed in detail, there is no termination that occurred here. He does answer your point. There's no issue of fact there at all. Internal records say he was terminated as of the 22nd. Rose Conville, assistant HR director, says he was terminated as of HR 22nd, and your assertion is those things don't create an issue of fact as to whether he was terminated. To the jury, Your Honor, and the other point that's made, and I know I'm expired, but I can just make one more point. The relationship, again, I think the judge looked at the Golden and Perry relationship and the comment that Mr. Golden made in the year 2004, which was the comment, the only comment that came out of the man's mouth, which in this record is just a hearsay upon hearsay. So it's Mr. Bell's relating to Mr. Perry what he believes he heard Mr. Golden say about Perry. So you're saying it should have been considered at all? Certainly. That should not have been considered by anybody? I'm just saying I'm sure the judge considered the fact that no one is mentioning the fact that what the appellate is relying on as evidence of animus in the case occurred over two years earlier. But that's, again, argument to the jury as to whether they should take that to heart. And then you also have Mr. Perry's testimony that Golden gave him jobs that weren't properly his. I don't think it is argument to the jury. I think the judge can look at the inadequacy of that evidence at this point in the case of summary judgment and say that's it. That's all there is here. And the termination issue is- To win your point, the conclusion has to be that no rational juror, no rational juror, could look at the evidence and come to a conclusion other than Judge Stengel's. Isn't that right? Yes, Your Honor. That's what Judge Stengel has indicated. Thank you, Your Honors. Thank you. Mr. Quirk, you reserved some time for a vote. It may go without saying, but the summary judgment standard is more than a scintilla of evidence. And we would submit that there is more than a scintilla of evidence of contradiction and confusion and outright refutation of the defendant's proffered reasons. With respect to the end of Mr. Perry's employment- Why don't you respond, if you would, to Mr. Elliott's statement that, or his, I understand it to be his argument, that when you reach back to 2004, you're reaching back to stuff which is so divorced in time from the actions that occurred in September 2006 that it really would be irrational for a jury. This just would be unfair. It wasn't wrong for Judge Stengel to come to the conclusion he did in light of that very large time gap. The two cases that I would point to for saying that the time gap, just the span of the time alone is not determinative are this Court's decision in Robinson v. SEPTA and the Ninth Circuit's decision in Porter v. California Department of Corrections. In Robinson, this Court looked at a complaint process that started in September 1983, a termination that occurred in December 1985, more than two years, more time than was at issue here, but it looked at the relationship in between. That was a case where the employee and the supervisor were together and there was intervening animosity. In the Ninth Circuit's Porter case, they were separated. In this case, they're separated and there's nothing. That's the Ninth Circuit's Porter case. It was a comparable time period. There was a rebuffed advance by the supervisor in 1995, and then the employee, Ms. Porter, didn't work under this gentleman's supervision until 1998 when there were all manner of adverse actions relating to use of leave time. The Court held that because they were separated during that time, the fact of the three years alone isn't dispositive or even especially enlightening. And that's the case here where they were separated from late in 2004 until just before this incident happened. Because of his disability leave, he wasn't there. Then he was back and two weeks later this occurred. And also because Mr. Golden had been transferred to another store for some of that time. And if I could just turn back to the end of employment and just emphasize that. The end of employment, Mr. Perry's case is in no way reliant on what Ms. Conville said, although what she said is certainly relevant. The point about if he had come back on the 25th, he would have been told he was terminated. He was already terminated. That's defendants' interrogatory answer. That's not a removed HR person. That's defendants' litigation answer. And it can't be reconciled with everything else that's said about how the employment ended. And because of all the contradictory evidence about why they fired him, why they reported him to the police, the case should have gone to the jury and the district court should be reversed. Thank you. Can I ask one more question? Yes, sir. You made a lot in your briefs about some spoilation of evidence, in particular the tapes. Did you raise that with the district court? Were there any hearings on that or anything? We raised the issue in our summary judgment opposition. I was not counseling the proceedings below, but I have not seen any indication of any hearing on that matter. It was briefed? It was briefed below, yes. And the matters that we're specifically focusing on are the 815 video, the transaction video, and the 830, the Perry HIT report, because either one of those should have been enough to tell Daley two days before the arrest that Perry wasn't the guy. And we do know that the HIT reports for the transactions that were looked at were printed on September 20th, two days before the arrest. The things that are missing are the things that clearly say Perry wasn't involved at all, let alone in the second and third transactions where even what they gave to the police showed he wasn't involved. The other thing I don't think the district court noted, Ms. Elam's statement in her affidavit with respect to that she seemed to be pressed to include Perry in what occurred. That's absolutely right. Again, I would just emphasize this is not our motion for summary judgment. We understand that Ms. Elam may not be the perfect witness in light of the circumstances, but that would go to weight, not to admissibility. And even what she said creates issues as to, you know, was Brian Golden completely separated from this, or was he really at the heart of it? Just one more thing. The statement your adversary brought up, you know, by Golden about how he could still fire him, is that properly considered by the district court? It seems like it might be double hearsay. The truth of the matter, though. Yeah. Okay. I think that it would be properly considered. It came in through the affidavit of Mr. Perry's brother, and so at the very least, and Mr. Perry testified that he was aware of it. I mean, in terms of atmosphere of hostility, I mean, it's possible that the person who heard misunderstood. It's possible that Mr. Perry misunderstood what the person heard. But I think that it would still be relevant. But in light of all the other evidence that we've been talking about, I would not argue that even that piece is necessary. I think it's relevant. But even without it, there's enough here from really their inability to get their story straight on what they did. What happened with the PHRC found probable cause? Was that communicated to the company? What happened after that, just the filing of the complaint? The filing of the complaint and the probable cause finding is part of the record as well. And so, I mean, that was before the district court as well. I mean, we made the point in our briefing. Okay. Thank you very much. Thank you. I take the case under advisement and ask the court to recess the court. Please rise. The court stands adjourned until April the 8th at 11 a.m.